**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **LYN WORL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 67 CDP (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the applications of Lyn Worl for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Complaint (Document Number 15). Defendant has filed a Brief in Support of the Answer. (Doc.

No. 16).

## Procedural History

On June 20, 2003, plaintiff filed her application for Disability Insurance Benefits and

Supplemental Security Income, claiming that she became unable to work due to her disabling

condition on August 15, 2001.[1] (Tr. 58-60). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 28, 2005. (Tr. 23, 12-22). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 5, 2005. (Tr. 7, 3-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on October 6, 2004. (Tr. 241). Plaintiff was present and was represented by counsel. (Id.). The ALJ began by admitting a number of exhibits into evidence. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she was born on April 9, 1954, and is married. (Tr. 242). Plaintiff stated that she lives with her husband in Chaffee, Missouri. (Tr. 243). Plaintiff testified that she completed two years of college at a junior college in 1976. (Id.). Plaintiff stated that she received a certificate in "Office Occupations," which required the completion of twenty credit hours. (Id.). Plaintiff testified that her husband works full-time. (Id.). Plaintiff stated that she became disabled in August of 2001, and that she has not worked since that time. (Id.). Plaintiff testified that she has a driver's license. (Tr. 244). Plaintiff stated that she lives in a house. (Id.).

Plaintiff testified that she has had numerous jobs. (Id.). The ALJ indicated to plaintiff's

---

[1]Plaintiff filed prior applications for Disability Insurance Benefits on February 14, 2000, and on October 15, 2002, which were denied at the initial level on March 2, 2000, and December 20, 2002, respectively. Plaintiff did not request further review of either of these initial denials. (Tr. 15).

attorney that ten jobs are listed on plaintiff's work history report, and that plaintiff's attorney need

not discuss each of these jobs in detail unless he finds the jobs relevant. (Id.). Plaintiff testified

that the job she held for the longest period of time was a position at an accounting firm in Denver,

Colorado, where she worked from 1987 to 1990. (Tr. 245). Plaintiff stated that three years is the

longest time she had held a position in the fifteen years prior to the hearing. (Id.). Plaintiff

testified that she worked as a file clerk at the accounting firm. (Id.). Plaintiff then stated that she

worked as a file clerk for Lakewood Ford Land, a car dealership, from 1995 to 1998. (Tr. 245-

46). Plaintiff explained that she left this job because she got married and moved from Colorado to

Missouri. (Tr. 246).

Plaintiff testified that she has had numerous jobs because she was trying to find a job that

she could perform successfully. (Id.). Plaintiff stated that she did not have problems performing

the jobs she has had. (Tr. 246-47). Plaintiff then testified that she experienced difficulty getting

along with co-workers. (Tr. 247). Plaintiff explained that there is usually a co-worker at each

workplace with which she does not get along. (Id.). Plaintiff testified that she believes co-

workers are trying to make her look bad or are out to get her. (Id.). Plaintiff stated that she also

believes some of her church friends are against her or talk badly of her. (Tr. 248). Plaintiff

testified that she has confronted these church friends and they deny being out to get her. (Id.).

Plaintiff testified that she receives all of her medical treatment at Bootheel Counseling.

(Id.). Plaintiff stated that she has talked to her counselor about her difficulties with other people.

(Id.). Plaintiff testified that the medical professionals at Bootheel Counseling prescribe all of her

medication. (Tr. 249). Plaintiff stated that she takes her medications as prescribed, but she

occasionally forgets to take her medication. (Id.). Plaintiff testified that she experiences difficulty

remembering other things as well, and that she has trouble concentrating. (Id.). Plaintiff stated that, for example, she has put her dog outside and then forgotten about it. (Tr. 250). Plaintiff testified that she has difficulty getting along with family members. (Id.). Plaintiff stated that she has gotten into arguments with her son and has tried to slap her son. (Id.). Plaintiff testified that she used to hit her husband, although the medication she takes now calms her and helps her handle situations better. (Tr. 251). Plaintiff stated that she has also hit the wall and injured her hand when fighting with her husband. (Id.). Plaintiff testified that this has occurred within a year prior to the hearing. (Id.). Plaintiff stated that she has never been involved in a physical fight at work. (Id.).

Plaintiff testified that her mood changes from day to day. (Id.). Plaintiff stated that she sometimes becomes really upset after reading a sad email and then laughs hysterically after reading another email. (Tr. 252). Plaintiff testified that she often becomes upset. (Id.). Plaintiff stated that watching televison improves her mood. (Id.). Plaintiff testified that she watches televison from 9:00 a.m. until she goes to bed at night, although she gets up during this time to eat and to do chores. (Tr. 252-53). Plaintiff testified that she checks her email when she wakes up in the morning. (Tr. 253). Plaintiff stated that she spends about fifteen minutes a day on the computer. (Id.).

Plaintiff testified that she feels fatigued constantly and she does not feel like doing housework. (Tr. 254). Plaintiff stated that she forces herself to complete a list of chores at her house, although she has worked cleaning other people's houses. (Id.). Plaintiff testified that she has no problem completing chores as long as she makes a list. (Tr. 255). Plaintiff stated that she does not have trouble getting out of bed. (Id.). Plaintiff testified that she does not take a shower

every day because she does not "feel like it," although she does watch television every day. (Id.). Plaintiff stated that her doctors have not told her what activities she should or should not do, and that they merely listen to her talk and adjust the dosages of her medication. (Id.). Plaintiff testified that the last time her medication was adjusted was in August or September of 2004, when her doctor increased her dosage of Prozac[2] and Seroquel.[3] (Tr. 256). Plaintiff stated that she believes her condition is about the same now as it was when she stopped working three years prior to the hearing. (Id.).

Plaintiff testified that she shops for groceries. (Id.). Plaintiff stated that she watches television during the day, and in the evenings she prepares dinner and then watches more television. (Tr. 257). Plaintiff testified that she typically goes to bed at 11:00 p.m. (Id.). Plaintiff stated that she occasionally experiences difficulty sleeping. (Id.). Plaintiff testified that she attends church every Sunday morning and Sunday night, and also attends church meetings and events. (Id.). Plaintiff stated that she goes on weekend camping trips with a group of about eleven family members. (Tr. 257-58). Plaintiff testified that she camps at local campgrounds and usually leaves on a Friday night and returns Sunday afternoon. (Tr. 258). Plaintiff stated she usually goes camping two to three times a year, although she only went on one camping trip the year of the hearing. (Id.). Plaintiff testified that she experiences difficulty maintaining interest in activities. (Tr. 259). Plaintiff stated that she used to enjoy making jewelry, but she lost interest in that activity. (Id.).

---

[2]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See Physician's Desk Reference (PDR), 1873-74 (59th Ed. 2005).

[3]Seroquel is a psychotropic drug indicated for the short-term treatment of acute manic episodes associated with bipolar I disorder. See PDR at 662-63.

Plaintiff testified that she is unable to work full-time because she feels like she cannot do anything right and she cannot please her supervisors.  (Id.).  Plaintiff stated that things always go wrong when she is working, and she does not realize that she has made a mistake.  (Id.).  Plaintiff testified that she could not work at a job that requires her to be on her feet constantly because her feet begin to hurt due to her weight.  (Tr. 260).  Plaintiff stated that she also experiences lower back pain, and that her chiropractor advised her not to lift over thirty pounds.  (Id.).

The ALJ then examined plaintiff, who testified that she is five-feet, five inches tall and weighs 230 pounds.  (Id.).  Plaintiff stated that she normally weighs 120 to 130 pounds, although the last time she weighed in this range was in 1981.  (Tr. 261).  Plaintiff testified that her weight has been in the current range since 2000.  (Id.).  Plaintiff stated that she weighed 150 pounds when she moved to Missouri in 1998, and that she has gradually gained weight since that time.  (Id.).  Plaintiff testified that she does not know if her weight is a concern to her doctors because she has not been to a doctor since 2002 or 2003.  (Id.).  Plaintiff stated that the last time she saw a doctor, she underwent an EKG,[4] which was slightly abnormal.  (Id.).  Plaintiff testified that her doctor recommended that she see a cardiologist, but she has not seen one because she does not have insurance.  (Id.).  Plaintiff stated that she has not been diagnosed with diabetes or high blood pressure, but she has tested her blood and found that her blood sugar levels are occasionally high.  (Tr. 261-62).  Plaintiff testified that she should probably be examined by a doctor but she cannot afford to go to the doctor.  (Tr. 262).

Plaintiff testified that she lives in Chaffee, Missouri, which is about twenty minutes from Cape Girardeau, Missouri, and about eight miles west of Scott City, Missouri.  (Id.).  Plaintiff

---

[4]Abbreviation for electrocardiogram.  Stedman's Medical Dictionary, 572 (27th Ed. 2000).

stated that she has a valid driver's license and that she drives on a regular basis. (Id.). Plaintiff testified that she drives about twenty to thirty miles a month. (Id.). Plaintiff stated that she drove to the hearing, after taking her husband to work. (Tr. 263). Plaintiff testified that her husband's place of business is about eleven miles from their home, and that their home is about ten miles from the hearing. (Id.). Plaintiff stated that her husband works as a driver for a warehouse. (Tr. 264). Plaintiff testified that her husband has medical insurance through his employer, but she is not covered under the policy because it would cost between $70 to $80 a week to add her to the policy. (Id.). Plaintiff stated that her husband's net income is about $1400 a month. (Id.). Plaintiff testified that she has no other income other than her husband's earnings. (Tr. 265). Plaintiff stated that she does not receive Medicaid benefits. (Id.).

Plaintiff testified that she experiences pain in her hips when she walks for extended periods. (Id.). Plaintiff stated that she is capable of walking eight blocks to her sister-in-law's house, although she does not feel motivated to do so. (Tr. 265-66). Plaintiff testified that she can stand for about twenty minutes. (Tr. 266). Plaintiff stated that her feet begin to swell after sitting at her computer for about twenty minutes. (Id.). Plaintiff testified that she has to sit in a reclining position to elevate her feet after they begin to swell. (Id.). Plaintiff stated that she has not seen a doctor about her feet swelling. (Id.). Plaintiff testified that she is able to walk up and down stairs, although it sometimes bothers her right knee. (Id.). Plaintiff stated that she can probably carry thirty pounds from one end of a room to the other. (Id.).

Plaintiff testified that she could not perform her past position as a garment finisher because she was not qualified for that position. (Id.). Plaintiff stated that the owner of the garment shop told her that she was not qualified for the position because she could not steam iron shirts

properly. (Tr. 266-67). Plaintiff testified that she was also antisocial when she worked at that position. (Tr. 267). Plaintiff stated that she was terminated from that position. (Id.). Plaintiff testified that the only job she felt she was capable of performing was filing, although she often misfiled things. (Id.).

Plaintiff testified that other than her church activities and camping trips, she does not belong to any other organizations or attend any other meetings. (Tr. 268). Plaintiff stated that she does the majority of the housework, although her husband helps with the vacuuming. (Id.). Plaintiff testified that she vacuums about three times a month. (Id.). Plaintiff stated that she also does the laundry, washes the dishes, and makes the bed. (Tr. 268-69). Plaintiff testified that she does not do any yard work because she experiences difficulty pushing the lawn mower. (Tr. 269). Plaintiff stated that her husband takes care of the yard. (Id.). Plaintiff testified that she does not smoke. (Id.). Plaintiff stated that she goes out to eat about once a week and she goes to the movies occasionally. (Id.). Plaintiff testified that she lives near her sister-in-law but she does not see her sister-in-law frequently. (Tr. 270). Plaintiff stated that she shops and runs errands with a friend from church. (Id.). Plaintiff testified that she occasionally visits with her husband's family members who live in the area. (Id.). Plaintiff stated that she occasionally goes out with her husband's family to dinner or to church activities. (Tr. 271).

The ALJ next examined the vocational expert, Dr. John E. Grenfell, who testified that he was present during the hearing and he examined the exhibits in this matter. (Id.). The ALJ asked the vocational expert to assume a hypothetical individual with plaintiff's age, education, training, past relevant work experience, who was limited to the light level of exertion, with the ability to lift and carry up to thirty pounds, and who was limited to not working closely with other people, and

not working regularly with the public. (Id.). The vocational expert testified that such an individual could perform plaintiff's past work as a file clerk, which is classified as light and low level semi-skilled. (Tr. 272). The vocational expert stated that there are 300,000 such jobs in the national economy and 6,000 in Missouri. (Id.). The vocational expert testified that such an individual could also engage in data entry, which is classified as sedentary and semi-skilled. (Id.). He stated that there are 600,000 of such jobs nationally and 15,000 in Missouri. (Id.). The vocational expert testified that plaintiff has performed such jobs in the past. (Id.). He stated that such an individual could also work as a cashier, which is classified as light and unskilled. (Tr. 273). The vocational expert testified that over 2,000,000 of such jobs exist nationally and 32,000 in Missouri. (Id.). The vocational expert then stated that these jobs would require working with the public. (Id.). The vocational expert next testified that such a person could work as a biscuit maker, which is classified as light and low-level semi-skilled. (Id.). He stated that there are 200,000 of such jobs nationally, and 4,000 in Missouri. (Id.). Finally, the vocational expert testified that such a individual could work as a garment finisher, which is classified as light and unskilled. (Id.). He stated that over 50,000 of such jobs exist nationally and 3,000 in Missouri. (Id.).

The ALJ then asked the vocational expert to impose the additional limitation of low stress, simple repetitive work. (Id.). The vocational expert testified that the individual could still perform all of the jobs previously identified, as they are all considered low stress repetitive work. (Id.).

Plaintiff's attorney then questioned the vocational expert, who testified that the jobs identified would generally allow two to three absences a month. (Tr. 274). The vocational expert

testified that the data entry job is considered semi-skilled and requires the most skills of all the jobs he identified.  (Id.).  Plaintiff's attorney commented that he was not sure that plaintiff had performed the data entry job long enough to learn the job because plaintiff only worked at that position for a few weeks.  (Id.).  Plaintiff's attorney then indicated that he had no additional questions, and that the record was complete.  (Id.).

### B.  Relevant Medical Records

The record reveals that plaintiff saw R. Brent Voszler, M.D. from January 1999 to May 2001 for various complaints, including headaches, sinusitis, cervical[5] spine strain, abdominal pain, urinary tract infection, allergies, ear pain, chest congestion, sore throat, sinus pressure, warts and calluses on her feet, depression, and second degree burns.  (Tr. 212-23).  Dr. Voszler treated plaintiff's various minor physical impairments and prescribed Effexor[6] and Prozac for plaintiff's depression.  (Id.).

Plaintiff presented to Bootheel Counseling Services in Sikeston, Missouri on December 14, 2001.  (Tr. 154).  Plaintiff reported crying spells, mood swings, difficulty sleeping, hypomanic episodes and some transitory auditory hallucinations.  (Id.).  Plaintiff stated that she had quit her job earlier that year, and that she was not able to hold a job for a significant amount of time.  (Id.).  The intake therapist, Kyle Schott, noted that plaintiff was visibly nervous during the

---

[5]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[6]Effexor is indicated for the treatment of major depressive disorder.  See PDR at 3321.

session and stuttered slightly.  (Id.).  He found that plaintiff was indecisive and tends to rely on

others.  (Id.).  Mr. Schott's impression was bipolar disorder[7] and personality disorder.[8]  (Id.).  He

assessed a Global Assessment of Functioning (GAF)[9] score of 56.[10]  (Id.).

Plaintiff saw Mr. Schott at Bootheel Counseling Services on January 3, 2002 for a therapy

session.  (Tr. 167).  Mr. Schott found that plaintiff's mood was depressed and that plaintiff

exhibited irrational thoughts.  (Id.).  Mr. Schott noted that plaintiff allows others to influence her

behavior beyond what is rational.  (Id.).  He recommended that plaintiff obtain a prescription for

Prozac and return for a follow-up in two weeks.  (Id.).

On January 14, 2002, Mr. Schott reported that plaintiff's mood was depressed and

anxious.  (Tr. 166).  He stated that plaintiff possesses several core irrational beliefs and has low

self-esteem.  (Id.).  Plaintiff's thought process was described as loose associations.  (Id.).  Mr.

Schott recommended that plaintiff continue to work on cognitive distortions and return for a

follow-up in two weeks.  (Id.).

---

[7]An affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression.  Stedman's at 526.

[8]Behavior disorder characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning. Stedman's at 527.

[9]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[10]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

Plaintiff attended a counseling session with Mr. Schott on January 29, 2002. (Tr. 165). Plaintiff's mood was anxious and her thought process was coherent. (Id.). Mr. Schott reported that plaintiff's anxiety and depression continue and that she was still experiencing periods of extreme irrational thoughts. (Id.). He noted that plaintiff was cooperative but has difficulty changing her thought patterns. (Id.).

On February 12, 2002, Mr. Schott described plaintiff's mood as depressed and anxious. (Tr. 164). Mr. Schott reported that plaintiff was able to identify her irrational beliefs and how these beliefs affect her behavior. (Id.). He also noted that plaintiff was very dependent upon others' views of her and that her anxiety remains high. (Id.).

Plaintiff saw Samina Khattak, M.D., a Staff Psychiatrist at Bootheel Counseling Services, on February 15, 2002, for an Initial Psychiatric Evaluation. (Tr. 150-52). Plaintiff reported symptoms of not getting along with people, mood swings, crying spells, indecisiveness, paranoia, sleeping all the time, low self-esteem, and helplessness. (Tr. 150). Dr. Khattak diagnosed plaintiff with depressive disorder,[11] rule out bipolar disorder; and personality disorder, paranoid, dependent. (Tr. 152). Dr. Khattak assessed a GAF score of 55. (Id.). Dr. Khattak prescribed Prozac and Zyprexa.[12] (Id.).

---

[11]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Diagnostic criteria for a major depressive episode include a depressed mood, a marked reduction of interest or pleasure in virtually all activities, or both, lasting for at least 2 weeks. In addition, 3 or more of the following must be present: gain or loss of weight, increased or decreased sleep, increased or decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished ability to concentrate, and recurring thoughts of death or suicide. Stedman's at 478.

[12]Zyprexa is a psychotropic drug indicated for the treatment of bipolar disorder. See PDR at 1899-1900.

Plaintiff saw Mr. Schott for a counseling session on March 5, 2002. (Tr. 163). Plaintiff's mood was described as appropriate. (Id.). Plaintiff reported that she was feeling much better after starting the Prozac and Zyprexa. (Id.). Mr. Schott described plaintiff's mood as "almost euphoric." (Id.). Plaintiff stated that her anxiety has decreased and she does not feel as paranoid. (Id.).

Plaintiff saw Mr. Schott on March 14, 2002, at which time her mood was described as appropriate and pleasant. (Tr. 162). Plaintiff reported that the Prozac and Zyprexa were working very well. (Id.). Mr. Schott discussed with plaintiff ways to dispute her irrational beliefs. (Id.). He noted that plaintiff continued to improve. (Id.).

Plaintiff saw Dr. Khattak on April 10, 2002, at which time she complained of worsening mood swings. (Tr. 149). Dr. Khattak's diagnosis was bipolar II disorder.[13] (Id.). Dr. Khattak increased plaintiff's dosage of Prozac for the two weeks before the start of plaintiff's menstrual cycles. (Id.). Plaintiff also met with Mr. Schott on April 10, 2002, at which time her mood was described as appropriate. (Tr. 161). Mr. Schott reported that plaintiff was able to utilize positive self talk to decrease her anxiety and depression. (Id.).

Plaintiff underwent counseling with Mr. Schott on May 9, 2002. (Tr. 160). Mr. Schott reported that plaintiff's mood has been fairly stable and that plaintiff believed that her medication helps significantly. (Id.). He stated that plaintiff was still working on controlling her irrational beliefs and emotions. (Id.). Mr. Schott also noted that plaintiff was thinking of returning to work and was encouraged to do so. (Id.). Plaintiff also saw Dr. Khattak on May 9, 2002. (Tr. 148).

---

[13]The essential feature of bipolar II disorder is a clinical course that is characterized by the occurrence of one or more major depressive episodes accompanied by at least one hypomanic episode. DSM-IV at 359.

Dr. Khattak reported that plaintiff's mood was good and that she was sleeping well. (<u>Id.</u>). Dr. Khattak found that plaintiff was "psychiatrically stable." (<u>Id.</u>).

Plaintiff saw Dr. Khattak on June 7, 2002. (Tr. 147). Dr. Khattak stated that plaintiff was "doing well." (<u>Id.</u>). Plaintiff reported feeling sluggish and fatigued. (<u>Id.</u>). Plaintiff indicated that she was able to do housework, laundry, cleaning, cooking, and go out with her husband. (<u>Id.</u>). Dr. Khattak increased plaintiff's dosage of Prozac and added Klonopin[14] to her medication regimen. (<u>Id.</u>).

Plaintiff saw Mr. Schott for a counseling session on July 16, 2002. (Tr. 159). Plaintiff's mood was described as anxious. (<u>Id.</u>). Mr. Schott reported that plaintiff continued to make improvement. (<u>Id.</u>). He indicated that he and plaintiff discussed ways for plaintiff to increase activity and work part-time or volunteer. (<u>Id.</u>). Mr. Schott noted that plaintiff's self-esteem was improved. (<u>Id.</u>). Plaintiff also saw Dr. Khattak on this date. (Tr. 146). Plaintiff complained of sedation from the Zyprexa, problems with her memory, and anxiety when around large groups of people. (<u>Id.</u>). Dr. Khattak found that plaintiff was otherwise doing well. (<u>Id.</u>). Dr. Khattak maintained plaintiff on her current medications. (<u>Id.</u>).

Plaintiff saw Mr. Schott for a counseling session on August 15, 2002. (Tr. 158). Plaintiff's mood was described as appropriate. (<u>Id.</u>). Plaintiff reported that she was feeling well and did not feel depressed, although she was having trouble with motivation. (<u>Id.</u>). Mr. Schott discussed with plaintiff ways to schedule activities so that she does not feel overwhelmed. (<u>Id.</u>). Plaintiff also saw Dr. Khattak on August 15, 2002. (Tr. 145). Dr. Khattak reported that plaintiff's mood was good and that plaintiff was sleeping well. (<u>Id.</u>). Dr. Khattak found no

---

[14]Klonopin is indicated for the relief of panic disorder. <u>See</u> <u>PDR</u> at 2895.

psychiatric symptoms and expressed the opinion that plaintiff was psychiatrically stable. (Id.).

Plaintiff saw Mr. Schott for a counseling session on September 12, 2002. (Tr. 157). Mr. Schott noted that plaintiff's depression and anxiety continued to decrease, although plaintiff's activity level remains low. (Id.). Mr. Schott counseled plaintiff on being more assertive. (Id.). Plaintiff also saw Dr. Khattak on September 12, 2002. (Tr. 144). Plaintiff complained of episodes where she feels sleepy, has decreased energy, and experiences dizziness. (Id.).

Plaintiff saw Mr. Schott for a counseling session on November 7, 2002. (Tr. 156). Mr. Schott reported that plaintiff continued to do "fairly well." (Id.). He noted that he was still working with plaintiff to normalize her behavior. (Id.). Plaintiff also saw Dr. Khattak on this date. (Tr. 143). Plaintiff reported that she was feeling much better, was more energetic, and was planning a trip to Colorado. (Id.).

Plaintiff met with Mr. Schott for a counseling session on December 9, 2002. (Tr. 155). Plaintiff reported that she was doing well, and that she will be flying to Colorado to spend time with family. (Id.). Mr. Schott noted that plaintiff's mood has been very stable. (Id.). He determined that it was an appropriate time to discontinue counseling. (Id.). Plaintiff also saw Dr. Khattak on this date. (Tr. 142). Dr. Khattak found that plaintiff was coping well and was doing much better. (Id.). Dr. Khattak noted that plaintiff works around the house, goes out, does the grocery shopping, and sleeps well. (Id.).

On February 20, 2003, plaintiff saw Grey Woodman, M.D. at Bootheel Counseling Services. (Tr. 141). Dr. Woodman noted that plaintiff was diagnosed with bipolar disorder and a personality disorder. (Id.). He stated that plaintiff has a paranoid personality, and that she believes everyone mistreats her. (Id.). Dr. Woodman found that plaintiff was doing "quite well"

on Prozac, Klonopin, and Zyprexa, and he renewed the prescriptions for these medications. (Id.).

Plaintiff saw another staff psychiatrist at Bootheel Counseling Services on March 17, 2003. (Tr. 140). Plaintiff's mood was described as depressed. (Id.). Plaintiff reported staying at home and taking frequent naps during the day. (Id.). Plaintiff also reported feeling anxious. (Id.). Plaintiff was continued on her medication regimen. (Id.).

Plaintiff saw Dr. Khattak on April 17, 2003. (Tr. 139). Plaintiff reported having no motivation or energy, and feeling depressed. (Id.). Dr. Khattak discussed the side effects of plaintiff's medications and decided to gradually decrease her dosages of the Zyprexa and Klonopin. (Id.).

Plaintiff saw Dr. Khattak on June 16, 2003 for a follow-up. (Tr. 138). Plaintiff reported no problems, and was continued on her current medication regimen. (Id.).

Plaintiff saw Dr. Khattak on August 11, 2003. (Tr. 137). Plaintiff reported some financial and transportation problems. (Id.). Plaintiff also complained of irritability and paranoia in public places. (Id.). Plaintiff's mood was described as "o.k." (Id.).

Plaintiff saw Syed Zahoor-Ul-Mueen, M.D. for a consultative examination on September 4, 2003. (Tr. 130-32). Plaintiff complained of increased anxiety and restlessness. (Tr. 130). Plaintiff reported that she experiences difficulty getting along with other people, and that she is very short-tempered and becomes upset very easily. (Id.). Plaintiff denied any suicidal ideation or homicidal thoughts. (Id.). Plaintiff also complained of pain in the bilateral wrist and hand with increased exertion and carrying more than 25 pounds of weight, numbness in her bilateral lower extremity with increased ambulation, fatigue, difficulty sleeping, crying spells, mild dizziness, heartburn, and mild aches and pains all over her body. (Id.). Plaintiff's medications were listed as

Zyprexa, Prozac, and Klonopin. (Tr. 131). Dr. Zahoor-Ul-Mueen's impression was anxiety disorder[15] and depression, with the possibility of bi-polar disorder. (Id.). Dr. Zahoor-Ul-Mueen found no clear symptoms of bi-polar disorder, but recommended that plaintiff obtain further psychiatric evaluation, as plaintiff reported a family history of bi-polar disorder. (Tr. 131-32). Plaintiff's physical examination was unremarkable, despite plaintiff's complaints of generalized aches and pains. (Tr. 132). Dr. Zahoor-Ul-Mueen noted that plaintiff has moderate, exogenous obesity and some physical deconditioning. (Id.). Dr. Zahoor-Ul-Mueen concluded that plaintiff should obtain a detailed psychiatric evaluation and baseline evaluation for her cardiorespiratory status. (Id.). With regard to plaintiff's mild low back and lower extremity aches and pains, he noted that there is a possibility of some mild osteoarthritis[16] because of her moderate exogenous obesity. (Id.). Dr. Zahoor-Ul-Mueen stated that no evidence of any significant medical or mental problem was found, and no obvious limitation in activities was noted. (Tr. 133).

Plaintiff underwent an MRI[17] of the lumbosacral spine on September 18, 2003. (Tr. 128-29). The reviewing physician, Mike Brown, M.D., found that plaintiff's lumbosacral spine was within normal limits. (Id.).

Plaintiff saw Dr. Khattak on October 9, 2003. (Tr. 126). Plaintiff reported no problems with mood swings, sleep, or appetite. (Id.). Plaintiff's medications were not changed. (Id.).

On October 15, 2003, Holly L. Weems, Psy.D. completed a Mental Residual Functional

---

[15]A mental illness involving anxiety reactions in response to stress. See Stedman's at 525.

[16]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which affects weight-bearing joints. See Stedman's at 1282.

[17]Abbreviation for magnetic resonance imaging. Stedman's at 1135.

Capacity Assessment. (Tr. 69-72). Dr. Weems expressed the opinion that plaintiff was moderately limited in her ability to carry out detailed instructions, work in coordination with others without being distracted by them, complete a normal workday without interruptions from psychologically-based symptoms and perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers without distracting them. (Tr. 70-71). Dr. Weems stated that plaintiff is not significantly limited in her ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Id.).

Dr. Weems also completed a Psychiatric Review Technique. (Tr. 74-86). Dr. Weems found that plaintiff has bipolar II disorder and anxiety, which do not precisely satisfy diagnostic criteria. (Tr. 77, 79). Dr. Weems also found that plaintiff has a personality disorder, characterized by pathologically inappropriate suspiciousness or hostility; persistent disturbance of mood or affect; pathological dependence, passivity, or aggressivity; intense and unstable interpersonal relationships; and impulsive and damaging behavior. (Tr. 81). In addition, Dr.

- 18 -

Weems noted the presence of alcohol abuse by history.  (Tr. 82).  Dr. Weems expressed the opinion that plaintiff has moderate limitations in maintaining social functioning; mild restrictions in activities of daily living, and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  (Tr. 84).

Plaintiff saw Dr. Khattak on December 8, 2003.  (Tr. 237).  It was noted that plaintiff's depression comes and goes.  (Id.).  Plaintiff complained of bad dreams and increased mood swings.  (Id.).  Dr. Khattak noted that plaintiff was experiencing paranoia symptoms.  (Id.).  Dr. Khattak discontinued plaintiff's Zyprexa prescription and started plaintiff on Seroquel.  (Id.).

On January 8, 2004, Dr. Khattak noted that plaintiff's depression was "not bad," and plaintiff was less anxious, although she still feels paranoid in public places.  (Tr. 125).  Plaintiff's medications were not changed.  (Id.).

On February 5, 2004, Dr. Khattak again noted that plaintiff's depression was "not bad." (Tr. 123).  Plaintiff reported feeling sleepy during the day.  (Id.).  Dr. Khattak described plaintiff's mood and affect as "brighter."  (Id.).

Dr. Khattak found no significant mood change on March 4, 2004.  (Tr. 122).  Plaintiff complained of a lack of motivation.  (Id.).  Plaintiff reported that she felt better after changing churches.  (Id.).  Dr. Khattak found plaintiff's mood and affect to be brighter.  (Id.).

On April 26, 2004, plaintiff reported crying episodes in addition to an episode of rage or anger.  (Tr. 121).  Dr. Khattak found that plaintiff's mood was "o.k.," and her affect was in the normal range.  (Id.).

On June 21, 2004, plaintiff reported feeling down and depressed sometimes.  (Tr. 120). Dr. Khattak found that plaintiff's mood and affect were within the normal range.  (Id.).

On August 30, 2004, plaintiff reported feeling frustrated and worried. (Tr. 230). Plaintiff stated that her depression comes and goes. (Id.). Plaintiff expressed concern that her husband might be having an affair. (Id.). Dr. Khatak found that plaintiff's mood was dysphoric. (Id.). Plaintiff's prescriptions for Seroquel and Prozac were increased. (Id.).

On October 25, 2004, plaintiff complained of difficulty with concentration and memory, and difficulty in interpersonal relationships. (Tr. 229). Plaintiff also reported sleeping a lot. (Id.). Dr. Khattak described plaintiff's mood as depressed and plaintiff's affect as tearful. (Id.). Plaintiff's dosage of Prozac was increased. (Id.).

On November 22, 2004, plaintiff reported that it was difficult for her to interact with friends and family. (Tr. 228). Plaintiff stated that she has mood swings, and that small things make her mad. (Id.). Plaintiff's mood was described as dysphoric. (Id.). Dr. Khattak decreased plaintiff's dosage of Seroquel and added Trileptal.[18] (Id.).

On December 20, 2004, plaintiff reported decreased mood swings, irritability, and sleepiness. (Tr. 227). Plaintiff stated that she sometimes feels down and depressed. (Id.). Dr. Khattak described plaintiff's mood as dysphoric and her affect as sad. (Id.). Plaintiff's dosage of Trileptal was increased, and her dosage of Seroquel was decreased. (Id.).

On January 20, 2005, plaintiff reported some minor mood swings and sleepiness during the day. (Tr. 226). Dr. Khattak noted that plaintiff was able to deal with stress at church. (Id.). Plaintiff's mood and affect were described as brighter. (Id.).

---

[18]Trileptal is an antiepileptic drug indicated for the treatment of partial seizures. See PDR 2380-2382.

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on August 15, 2001, the date the claimant stated she became unable to work, and she continues to meet them.

2. The claimant has not engaged in substantial gainful activity since August 15, 2001.

3. The claimant's bipolar disorder and history of an anxiety disorder and mood disorder is considered "severe" based on the requirements in the Regulations. The claimant's obesity, bilateral carpal tunnel syndrome, shortness of breath, back pain, and hypertension have not been substantiated by any objective medical evidence and/or diagnostic laboratory techniques and are "non-severe" within the regulatory definition.

4. These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant's residual functional capacity and limitations are found to be the light level of exertion with limitations to not working with close interactions with other people, no working with the public or in public, with a limitation to low stress, simple repetitive work.

7. The claimant's impairment does not prevent the claimant from performing her past relevant jobs as a file clerk, biscuit maker, and as a garment finisher; and there are: 6,000; 4,000; and 3,000 such jobs, respectively, in the state of Missouri. The vocational expert also testified that there are 300,000; 200,000; and 50,000 such jobs respectively, in the national economy. That is a significant number of past relevant jobs in both the state and the national economies.

8. The claimant did not sustain her burden of proving that she cannot perform her past relevant work.

9. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 20-21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on June 19, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

It is further the decision of the Administrative Law Judge that, based on the application filed on June 19, 2003, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 21-22).

## Discussion

**A.**     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

<u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See</u> <u>id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§

404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.** **Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity. The undersigned will address each claim in turn.

**1.** **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Plaintiff specifically argues that the ALJ erred by failing to consider plaintiff's testimony regarding her limitations. Defendant contends that the ALJ made a proper credibility determination and found that plaintiff's allegations regarding her limitations were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of

the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence. The ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain. The ALJ first discussed the medical evidence. The ALJ initially determined that plaintiff's alleged physical impairments, namely her obesity, bilateral carpal tunnel syndrome, shortness of breath, back pain, and hypertension, have not been substantiated by any objective medical evidence and are "non-severe." (Tr. 18). This conclusion is supported by the medical record. Plaintiff underwent an MRI in September of 2003, which revealed that plaintiff's lumbosacral spine was within normal limits. (Tr. 128-29). In addition, Dr. Zahoor-Ul-Mueen found that plaintiff's physical examination was unremarkable. (Tr. 132). Dr. Zahoor-Ul-Mueen stated that no evidence of any significant medical problem was found. (Tr. 133). The record is devoid of any other evidence of physical impairments.

With regard to plaintiff's mental impairments, the ALJ pointed out that plaintiff has never

been hospitalized, nor has she attempted suicide. The ALJ stated that plaintiff's examining doctors assessed a GAF score of 55 and 56, which is indicative of only moderate difficulty in social, occupational, or school functioning. (Tr. 152, 154). The ALJ noted that none of plaintiff's treating physicians indicated that plaintiff's impairments present more than a moderate limitation to her activities of daily living, social functioning, or maintaining concentration, persistence and pace. The ALJ pointed out that, although plaintiff claims limitations to her concentration and attention, none of her treating or attending physicians indicated that she has any limitations to her concentration or attention.

The ALJ further stated that plaintiff's symptoms have improved since she began taking the appropriate medications. Specifically, the ALJ noted that plaintiff's anxiety and paranoia have decreased, her sleep and appetite have increased, and her self-esteem has improved with therapy and medication. The ALJ's findings are supported by the medical record. Plaintiff's records from Bootheel Counseling Services reveal that plaintiff's psychiatric impairments responded well to medication and therapy. On March 5, 2002, plaintiff's counselor, Mr. Schott, reported that plaintiff was feeling much better after starting Prozac and Zyprexa, and that plaintiff's anxiety and paranoia had decreased. (Tr. 163). On May 9, 2002, Mr. Schott stated that plaintiff's mood was stable and that plaintiff believed that her medication helped significantly. (Tr. 160). He also noted that plaintiff was thinking of returning to work and encouraged plaintiff to do so. (Id.). Dr. Khattak reported that plaintiff was "psychiatrically stable" on May 9, 2002 and on August 15, 2002. (Tr. 148, 145). On November 7, 2002, plaintiff reported to Dr. Khattak that she was feeling much better, was more energetic, and was planning a trip to Colorado. (Tr. 156). On December 9, 2002, Mr. Schott reported that plaintiff was doing well and that her mood had been

very stable. (Tr. 155). Mr. Schott determined that it was appropriate to discontinue counseling at that time. (Id.). On February 20, 2003, Dr. Woodman found that plaintiff was doing "quite well" on her medications. (Tr. 141). Plaintiff reported no problems to Dr. Khattak on June 16, 2003, or October 9, 2003. (Tr. 138, 126). Dr. Khattak described plaintiff's mood and affect as "brighter" on February 5, 2004, March 4, 2004, and January 20, 2005. (Tr. 123, 122, 226). Further, Dr. Zahoor-Ul-Mueen, the consultative physician, found no evidence of a significant mental problem. (Tr. 133). "Impairments that are controllable or amenable to treatment do not support a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999).

The ALJ next discussed plaintiff's testimony regarding her daily activities. The ALJ stated that plaintiff does laundry, cleans dishes, buys groceries, and watches television each day despite her fatigue and other complaints. In addition, plaintiff testified that she drives on a regular basis (Tr. 262), attends church two times a week (Tr. 257), attends church meetings and events (Tr. 257), occasionally goes shopping with a friend from church (Tr. 270), goes out to dinner and to the movies (Tr. 269, 271), and occasionally goes on camping trips with her family from Friday night through Sunday (Tr. 257-58). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ concluded that plaintiff's limitations are "not totally credible." (Tr. 21).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling impairments are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

### 2.        Residual Functional Capacity

Plaintiff next argues that the ALJ erred by assessing a residual functional capacity that was not based on the medical evidence of record and by not explaining the basis of his determination. Defendant argues that the ALJ correctly determined plaintiff's residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer, 245 F.3d at 704). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

After discussing the objective medical evidence and plaintiff's own statements regarding her impairments, the ALJ concluded:

> [plaintiff's] residual functional capacity and limitations are found to be the light level of exertion with limitations to not working with close interactions with other people, no working with the public or in public, with a limitation to low stress, simple repetitive work.

(Tr. 20). "Light work" is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or

carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b); 416.967(b).

The ALJ's residual functional capacity assessment is supported by the record as a whole. First, the ALJ's determination that plaintiff is capable of performing light work is consistent with plaintiff's own testimony. Plaintiff testified that she could lift and carry thirty pounds and walk eight blocks at a time, although she "just [did not] feel motivated to [do so]." (Tr. 265-66). In addition, as discussed with regard to plaintiff's credibility, plaintiff testified that she does laundry, washes dishes, shops for groceries, watches television, drives, attends church, goes camping, and goes out to eat. Plaintiff stated that she makes a list of chores to do each day and that she always completes her list. (Tr. 254). Plaintiff testified that, as long as she has a list, she could "probably" complete daily tasks. (Tr. 255). Thus, plaintiff's own testimony regarding her activities is consistent with the ability to perform light work with some restrictions due to her mental impairments.

The ALJ's determination is also supported by the medical record. As previously discussed, the medical record is not supportive of any physical restrictions. With regard to plaintiff's mental impairments, the ALJ found that plaintiff should not work in an environment requiring close interactions with other people, or with the public, and that plaintiff should be limited to low stress, simple repetitive work. Dr. Weems, the consultative psychologist, expressed the opinion that plaintiff had moderate limitations in her ability to carry out detailed

instructions; work in coordination with other without being distracted by them; complete a normal workday without interruptions from psychologically based symptoms, and perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them. (Tr. 70-71). Dr. Weems found that plaintiff did not have significant limitations in any other area of mental functioning. (Id.). As such, the mental limitations found by the ALJ are consistent with the opinion of Dr. Weems. The ALJ's determination is also supported by the records of plaintiff's treating mental health professionals, who found that plaintiff's symptoms significantly improved with proper medication and therapy.

The ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole. The ALJ performed a credibility analysis and determined that plaintiff's subjective allegations were not entirely credible. The ALJ then properly assessed a residual functional capacity that is consistent with the objective medical evidence and plaintiff's own testimony. The record is not supportive of any greater restrictions than those found by the ALJ.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act, be affirmed.

The parties are advised that they have eleven (11) days, until August 25, 2006, to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this 14th  day of August, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE